## BROWN v. UNION PAC. R. CO.

No. 4826.   Decided August 21, 1930.   (290 P. 759.)

476

*Geo. H. Smith, J. V. Lyle, R. B. Porter,* and *W. Hal. Farr,* all of Salt Lake City, for appellant.

*Willard Hanson, A. H. Hougaard,* and *E. D. Sorenson,* all of Salt Lake City, for respondent.

EPHRAIM HANSON, J.

This is an action to recover damages for injuries suffered by respondent by being struck by one of the cars of appellant. The verdict was for the plaintiff, and defendant appeals.

The appellant has assigned fifteen errors, but has argued only four of them. Under the rule established, the assignments of error not argued are deemed waived, ■ and will not be considered.

The first two assignments relate to the refusal of the trial court to grant a directed verdict; the third relates to the refusal of the court to give a requested instruction; and the fourth relates to the refusal of the court to grant a new trial.

By the first two assignment of error the appellant urges that the court should have granted a directed verdict, because (a) the plaintiff failed to prove the defendant guilty of any negligence; (b) the evidence shows that the plaintiff could have seen the approaching cars and engine if he had looked and listened, and his failure to look and listen constitutes negligence barring recovery; and finally (c) the evidence shows an executed release for a valuable consideration, and the evidence of fraud to justify setting the release aside is absent.

The record discloses that the respondent was employed in Denver to work for the appellant company in Western Wyoming; that he was furnished with transportation at Denver, became a passenger of the railroad company, and was carried to Green River, Wyo., where the ■ cars carrying respondent and other laborers were stopped for the night. In order to obtain breakfast it was necessary for respondent and other laborers to cross several tracks in the railroad yards; the restaurant being in the west end of the depot.

The respondent testified that, as he left his car, he stopped and looked to see if a train was approaching and saw none, though he saw a baggage car up the track. This baggage car was shoved or shunted down the track towards respondent; it struck him, and he was seriously injured. The evidence of appellant's witness King shows that the baggage car with others was being pushed by an engine, and there was no one on the front end to give signals as to watch out for what was ahead. There is no pretense that any warnings were given of the impending movement of the baggage car. The negligence of appellant clearly appears.

Counsel for appellant vigorously argue that the rule relating to the duty of a person about to cross a railroad track to look and listen and to heed what might be heard or seen, as announced in *Teakle* v. *San Pedro, etc.*, 32 Utah 276, 90 P. 402, 10 L. R. A. (N. S.) 486, governs this case. In addition to that case, they rely upon the following: ■ *Lawrence* v. *Denver & Rio Grande Railroad Co.*, 52 Utah 414, 174 P. 817; *Rattie* v. *Minneapolis, St. Paul & S. S. Marie Ry. Co.*, 55 N. D. 686, 215 N. W. 158; *Morser* v. *Southern Pacific Co.*, 124 Or. 384, 262 P. 252; and *Lake Erie & W. R. Co.* v. *Stick*, 143 Ind. 449, 41 N. E. 365.

All these cases involve the duties of pedestrians or persons driving an automobile who approach and attempt to cross a railroad track. The duties of such persons to look and listen, and to heed oncoming trains in full view, are well stated in those cases.

But this case involves the duty of a passenger who is so placed by a railroad company that it is necessary for him to cross tracks in order to get to a restaurant. The authorities are quite clear that the measure of care and attention by such a person is not so great as that imposed upon a pedestrian, who is not a passenger, who attempts to cross the railroad tracks. The rule is well stated in 10 C. J. at page 929, § 1351, that, as to passengers, "the strict rule as to looking and listening which is in general applicable to persons crossing the tracks of railroad companies does not apply, the passenger having a right to suppose that the place where he is allowed to get on board, or alight from, a train or car is a safe place, and that all trains will comply with the law by giving warning, displaying lights," etc.

And again the rule is stated in 10 C. J. at page 1112 in the following language:

"But a passenger who is in the act of going to or leaving the train at a place where there is an express or implied invitation for him to do so, as where it is necessary for him to cross the tracks, may assume that the railroad company will so operate its other trains, or otherwise perform its duty, as not to put him in peril, and he is not under the same obligation to look out for his own safety by looking and listening as is incumbent in general on a person who approaches a railroad track with intent to cross it; and accordingly it has been held that it is not contributory negligence per se for a passenger in passing from the depot to the train, or vice versa, to attempt to cross an intermediate track without first looking and listening for the purpose of ascertaining whether a train is approaching or not, but the question is ordinarily one for the jury to decide under all the facts and circumstances of the case."

This text is amply sustained by the cases cited in the notes. The cases cited and relied upon by the appellant, therefore, have no application to the facts of this case.

Respondent relies upon the cases cited in Corpus Juris, many of which we have examined. We are content to quote from and refer to but one of these numerous cases. In *Warner* v. *Baltimore & Ohio Railroad Co.*, 168 U. S. 339, 18 S. Ct. 68, 70, 42 L. Ed. 491, Mr. Justice White says:

"The duty owing by a railroad company to a passenger actually or constructively in its care is of such a character that the rules of law regulating the conduct of a traveler upon the highway when about to cross and the trespasser who ventures upon the tracks of a railroad company are not a proper criterion by which to determine whether or not a passenger who sustains injury in going upon the tracks of the railroad was guilty of contributory negligence. A railroad company owes to one standing towards it in the relation of a passenger a different and higher degree of care from that which is due to mere trespassers or strangers, and it is conversely equally true that the passenger, under given conditions, has a right to rely upon the exercise by the road of care;. and the question of whether or not he is negligent, under all circumstances, must be determined on due consideration of the obligations of both the company and the passenger."

The contention of the respondent is well sustained by the cases, and, as the negligence of appellant clearly appears in the record, and the jury decided there was no contributory negligence on the part of respondent, appellant's contention must fail.

The contention of appellant that the evidence shows an executed release for a valuable consideration and that the evidence of fraud which would justify setting the release aside is absent presents a more serious question.

It appears that respondent, on December 8, 1928, signed a release of all claims growing out of the accident on account of which this action was brought. The release was a printed form of the appellant company, filled in with typewriting, and in form is a receipt for $875, in consideration of the payment of which sum the respondent releases the appellant from all claims or causes of action for damages growing out of an accident occurring on or about August 26, 1928, at or near Green River, Wyo., being the accident mentioned in the complaint.

The respondent admits he signed said release, and admits that he received the sum of $331. The balance of $534 was used to pay the hospital expenses and the doctor's bill run by respondent while he was in the hospital.

In answer the appellant pleaded this release as a complete defense to the plaintiff's alleged cause of action; and the respondent, in the reply, alleged that the release had been obtained by means of fraud, and particularly in that the agents of appellant represented to him that they would pay him the sum of $331 to cover the loss of wages while he was in the hospital, and that it would be necessary for them to have a receipt to turn in to the defendant company, and that they pretended that the paper they presented to him was only such a receipt. He alleges that he was suffering great physical pain and mental suffering, that the room where the transaction took place was dark and had but little light, and that, by reason of his not having glasses, he was unable to read the paper; that he relied upon their statements that it was only a receipt for wages; that it was not read to him and he could not read it, etc.

The testimony of the respondent tends to prove these allegations. On the part of appellant there was evidence which tended to prove that Mr. Patsch, an adjuster for the railroad company, visited the respondent in the hospital at least ten times from September 2 to December 8, 1928; that on the occasion of some of these visits offers were made to settle any claim respondent might have against appellant, at first $500, then $600, and finally $875, the latter figure to cover the hospital and doctor's bills and leave $331 for respondent; that on December 8, Mr. Patsch and Mr. Clark, the claim agent of the company, visited him and said they would like to make a settlement if he was ready to make one; that Clark had been told that respondent wanted $300 in addition to the amount of the doctor's bill and the hospital bill; that it was then ascertained that the hospital bill was $365.65 and the doctor's bill was $175; that respondent agreed to accept this amount; that Mr. Clark wrote the release on Mr. Patsch's typewriter; that respondent read the paper, told them he had read it, and then wrote on the bottom of it the words, "I have read the foregoing receipt and release and fully understand it," and then signed it; that a

man by the name of Perry signed it as a witness and Mr. Clark and Mr. Patsch also signed it as witnesses; that the parties left the hospital in a taxi and went to the bank, where they met Mr. Le Marr, the assistant cashier, who had respondent sign the release in his presence under the signature already appearing on the instrument, and then took his acknowledgment of the signature, and impressed his notarial seal upon it; thereupon the respondent indorsed the draft for $875, the banker gave respondent $6.15 in cash, opened an account for him, and gave him a book showing a credit of $325, and made out two cashier's checks, one payable to the doctor for $175 and one payable to the hospital for $368.25; heard Mr. Clark ask respondent if "he knew he was signing an entire release" and heard respondent answer that he did so understand. The witnesses Hayes and Miller, who are claim adjuster and chief clerk of the general claim department of appellant, respectively, testified that respondent in applying for a pass, stated that he had made a settlement with the company and had signed a release, and that the company was under no obligation to furnish him a pass.

Appellant vigorously contends that, in view of this evidence, the court should have treated the question of negligence as a question of law and should have directed a verdict in favor of appellant.

The following cases are relied upon by appellant in support of its contention: *Snelgrove* v. *Earl*, 17 Utah 321, 53 P. 1017; *Whitney Co.* v. *Johnson*, (C. C. A.) 14 F. (2d) 24; *Hanley* v. *Hines*, 176 Wis. 252, 186 N. W. 602; *McKenney* v. *Boston El. Ry. Co.*, 259 Mass. 28, 155 N. E. 788; *Austin* v. *Brooklyn Cooperage Co.*, (Mo. App.) 285 S. W. 1015; *Florida East Coast Ry. Co.* v. *Thompson*, 93 Fla. 30, 111 No. 525; *Keys* v. *Hanscom Bros., Inc.*, 288 Pa. 389, 135 A. 860; *Allgood* v. *Tarkio Electric & Water Co.*, 222 Mo. App. 964, 6 S. W. (2d) 51; *Rader* v. *Lehigh Valley R. Co.*, (C. C. A.) 26 F. (2d) 73; *Carlson* v. *Northern Pacific Ry. Co.*, 82 Mont.

559, 268 P. 549, 58 A. L. R. 1304; *Pacific Mutual Life Insurance Co.* v. *Webb,* (C. C. A.) 157 F. 155, 13 Ann. Cas. 752.

We have read and carefully considered all the cases relied upon by appellant. Each of these cases was decided, as all cases must be, upon its own facts. In some of the cases the court reached the conclusion that on facts perhaps no stronger in favor of the company than the facts in the case at bar it became a question of law as to whether or not the release could stand as a bar to the prosecution of the suit, and held as a matter of law that sufficient proof of the alleged fraud had not been made. In other cases the negligence of the person signing the instrument was so manifest in failing to read or ascertain the contents of this instrument that the courts did not hesitate to declare that as a matter of law the instrument must stand. Such a case is *Snelgrove* v. *Earl,* 17 Utah 321, 53 P. 1017, the only Utah case relied upon by appellant. The syllabus of this case reads as follows:

"Where one signs a mortgage without reading it, if he has the opportunity to do so, or, if he cannot read, without asking to have it read to him, or declining to have the instrument read or explained to him by one who offers to do so, on the assurance of a third party that the instrument is all right, he cannot avoid the legal effect of his signature as against the original payee, who was guilty of no fraud or deception in its execution."

A mere reading of this syllabus will show that it cannot be used as an authority in favor of appellant.

The respondent has cited many cases in support of his contention that the conduct of the agents of appellant company, as shown by the evidence, in having the respondent sign away a claim worth $6,000, being the amount of the verdict and no question being made that the verdict is excessive for the sum of $331, plus hospital and doctor's bills, while he was sick and in distress, and without friends to advise him, and all the circumstances surrounding the signing,

were such as to make it a question of fact for the jury as to whether or not he was justified in signing the release without reading it.

It is a hopeless task to review the authorities on the question, even those cited by the parties, much more those published in the books. As was said by Justice Thurman in *Dovich* v. *Chief Con. Mining Co.*, 53 Utah 522, 174 P. 627, 631, "Every case must be decided upon its own facts." In that case it is true it was shown that the plaintiff, who had signed a release, could not read or write the English language; whereas in the case at bar it was shown that the plaintiff could not read without glasses, and he did not have them and could not get them. In that case it was shown that the insurance adjuster talked to the plaintiff about insurance and ended by having the plaintiff sign a release of all claims for damages against the mining company; in the present case the claim agents talked to plaintiff about paying him for his time while he was in the hospital and ended by obtaining a release of all claims for damages. In the Dovich Case the pertinent inquiry was made:

"The question, under these conditions, naturally arises, why should plaintiff not trust Fitch implicitly? Why should he be suspicious and required to exercise the extraordinary care and diligence contemplated in defendant's requests?"

In the present case it is shown that a negro workman was seriously injured; was taken to a hospital by appellant's agents; was constantly treated by appellant's physician for months; was visited many times by appellant's agent, who ingratiated himself into respondent's confidence; was then hurriedly urged into making a settlement in writing of, as he says he understood, his claim for loss of wages while in the hospital, but in fact his claim for damages of all kinds; was then taken away in a taxi to a bank, where the banker was obligingly waiting after banking hours; was asked by the banker, who was also a notary public, to again sign the release; was handed a draft for

$875, face downward, and directed to sign his name on the back of it; was handed the sum of $6.15 in cash and given credit in a bankbook for $325, and was then taken back to the hospital, from whence he was next day discharged, though still sick. On this state of facts we think that the trial judge was amply justified in submitting the question to the jury.

The next assignment of error argued by appellant is that the court erred in refusing to give defendant's  requested instruction No. 20, reading as follows:

"The jury is instructed that it was the duty of the plaintiff to read the release before signing it and that if he was unable to read it, to have it read to him. You are therefore instructed that if the plaintiff had the opportunity to read it, or have it read to him, but did not do so, he was guilty of negligence in signing such release and is not entitled to have it set aside or to recover in this action."

What we have said above disposes of this assignment. It is not in all cases the imperative duty of a person to read an instrument before signing it, or to have it read to him, at the risk of being bound by its terms. The books abound in cases where a person who has signed an instrument without reading it has been relieved of liability as a result of his act. "Each case must be decided on its own facts;" and in this case there was sufficient evidence to require the submission to the jury of the question as to whether or not the respondent had been imposed upon.

The final assignment urged by appellant is that the court erred in denying and overruling the defendant's motion for new trial. Counsel, in arguing this assignment, have set forth in their brief practically all the testimony given at the trial relating to the signing by respondent of the release, and call our attention to the fact that on the one hand, we have only the testimony of the plaintiff, and, on the other hand, his conduct and the testimony of six witnesses, and they add:

"It was his (the trial judge's) duty to set aside this verdict."

As to this point the case is ruled by our decision in *McLaughlin* v. *Chief Con. Mining Co.*, 62 Utah 532, 220 P. 726, 733, where it is said:

"'It is argued that the undisputed evidence shows conclusively that the release was valid in every way, and that no fraud was committed in its procurement. On this proposition the evidence was conflicting. It is not for us to judge its weight nor to pass upon the credibility of witnesses."

And again:

"The jury passed upon the conflicting evidence, and, having by its verdict found in favor of plaintiff, that finding must be left undisturbed. When in a law case the evidence is conflicting and the court has denied a motion for new trial, the judgment must stand."

The evidence in this case was conflicting. It was the duty of the court to submit the case to the jury. The jury saw and heard all the witnesses and believed the plaintiff had been imposed on. The trial court, having seen and heard the witnesses, did not feel justified, although it had the power, to set aside the verdict because it was against the evidence. We, who have only read the record of the trial and proceedings, are asked to say that the jury and the trial judge did not do their duty. This we are unwilling to do. The appellant had a fair trial, and the trial court committed no errors. Two juries have said that the respondent was taken advantage of by appellant's agents. The judgment must be sustained.

The judgment is therefore affirmed, with costs to respondent.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.